UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 18-cr-130 |
| v. | 18 U.S.C. § 371 |
| | 15 U.S.C. § 78m(b)(2),(5) |
| | 15 U.S.C. § 78ff(a) |
| | 18 U.S.C. § 2 |
| PETER ARMBRUSTER, | 17 C.F.R. § 240.13b2-2 |
| MARK WOGSLAND, and | 18 U.S.C. § 1349 |
| BRET NAGGS, | 18 U.S.C. § 1348 |
| | 18 U.S.C. § 1343 |
| Defendants. | 18 U.S.C. § 1344 |
| | 15 U.S.C. § 78j(b) |
| | 15 U.S.C. § 78ff |
| | 17 C.F.R. §§ 240.10b-5, 240.10b5-2 |
| | 18 U.S.C. § 981(a)(1)(C) |

## FIRST SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES THAT:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment, unless otherwise specified:

### The Defendants, Relevant Entities & Individuals

#### Roadrunner Transportation Systems, Inc.

1.     Roadrunner Transportation Systems, Inc. ("Roadrunner") was a transportation company that offered shipping and logistics services throughout North America.

2.     Roadrunner consisted of three primary operating segments:  (1) Truckload Logistics ("Truckload"), which provided pickup, delivery, and freight consolidation for large-volume shipments; (2) Less-than-Truckload, which provided similar services for smaller shipments; and (3) Global Solutions, which offered logistics services.  Roadrunner owned and operated several operating companies within these segments, including Roadrunner Intermodal Services, Inc. ("RRIS"), Expedited Freight Systems ("EFS"), and R&M Transportation ("R&M").

3.    Between May 2010 and January 2017, Roadrunner acquired more than 20 transportation companies. Roadrunner operated those companies and incorporated their financial results into Roadrunner's financial results.

4.    From in or around 2010 to in or around March 2017, Roadrunner's corporate headquarters was in Cudahy, Wisconsin, within the Eastern District of Wisconsin. As of December 31, 2015, Roadrunner had over 4,500 employees.

5.    Starting in or around May 2010, Roadrunner's stock was traded publicly on the New York Stock Exchange ("NYSE"), a national securities exchange, and was registered with the United States Securities and Exchange Commission ("SEC"), an agency of the United States, pursuant to Section 12(b) of the Securities Exchange Act of 1934. Roadrunner's stock traded on the NYSE under the ticker symbol "RRTS."

6.    Roadrunner reported $532,209,000 in quarterly revenue for the three months ending on September 30, 2016 and $1,481,273,000 in total revenue for the first nine months of 2016. During the same period, Roadrunner had a market capitalization of over $300 million.

## The Defendants & Other Relevant Individuals

7.    Defendant **PETER ARMBRUSTER** was the Chief Financial Officer ("CFO") of Roadrunner from at least 2010 to in or around April 2017. As Roadrunner's CFO, **ARMBRUSTER** was responsible for overseeing Roadrunner's books and records, and for signing and certifying Roadrunner's financial statements. **ARMBRUSTER** was a licensed Certified Public Accountant ("CPA").

8.    Defendant **MARK WOGSLAND** was Controller for the Truckload segment from in or around 2010 to in or around July 2014. As Truckload Controller, **WOGSLAND** was responsible for, among other things, overseeing accounting and financial statements for the Truckload segment, approving certain accounting entries in the books and records of Truckload

operating companies, and overseeing certain accounting and finance personnel at Truckload operating companies. From in or around July 2014 to in or around December 2017, **WOGSLAND** served as Director of Accounting for the Truckload segment, and was responsible for, among other things, consolidating financial results from various operating companies and providing accounting guidance to Roadrunner's accounting and finance employees. **WOGSLAND** was a licensed CPA. From at least in or around October 2015 to in or around April 2017, **WOGSLAND** reported to **ARMBRUSTER**. From in or around July 2014 through in or around October 2015, **WOGSLAND** reported to **BRET NAGGS**.

9.     Defendant **BRET NAGGS** was Controller for Roadrunner's Truckload segment from in or around July 2014 to in or around October 2015. As Truckload Controller, **NAGGS** was responsible for, among other things, overseeing accounting and financial statements for the Truckload segment, approving certain accounting entries in the books and records of Truckload operating companies, and overseeing certain accounting and finance personnel at Truckload operating companies. **NAGGS** reported to **ARMBRUSTER**. **NAGGS** was a licensed CPA.

10.     From at least in or around 2010 until in or around 2018, Individual 1 was a member of Roadrunner's Board of Directors.

11.     Executive 1 was an executive who worked in a finance role at Roadrunner's corporate headquarters from in or around 2010 to in or around November 2014. Executive 1 reported to **ARMBRUSTER**.

12.     Executive 2 was an executive who worked in a finance role at Roadrunner's corporate headquarters from in or around January 2015 through in or around April 2017. Executive 2 reported to **ARMBRUSTER**.

## Roadrunner's Financial Regulators, Auditors, and Lenders

The United States Securities and Exchange Commission

13.   The SEC was an independent agency of the United States government charged by law with preserving honest and efficient markets in securities. The federal securities laws, regulations, and rules were designed to ensure that the financial information of publicly traded companies was accurately recorded and disclosed to the investing public. Securities laws, as well as the SEC's regulations and rules for public companies, required that Roadrunner and its directors, officers, and employees, among other things, make and keep books, records, and accounts that accurately and fairly reflected the transactions and disposition of Roadrunner's assets, and prohibited the knowing falsification of Roadrunner's books, records, and accounts.

14.   Roadrunner was required to file annual reports ("SEC Forms 10-K") and quarterly reports ("SEC Forms 10-Q") with the SEC, which contained financial statements that accurately and fairly presented the financial condition of Roadrunner, as well as other reports that contained information about Roadrunner's management, Board of Directors, business operations, and performance.   Through these reports, Roadrunner disclosed its financial information to Roadrunner's shareholders, independent auditors, regulators, lenders, and the investing public.   In addition to Roadrunner's reports filed with the SEC, Roadrunner also disclosed its financial information to shareholders through press releases, earnings calls, and earnings announcements.

15.   As CFO of Roadrunner, **ARMBRUSTER** signed certifications attesting that, among other things, (a) "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; (b) "[b]ased on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the

financial condition, results of operations and cash flows of [Roadrunner] as of, and for, the periods presented in this report"; and (c) **ARMBRUSTER** had disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in [Roadrunner's] internal control over financial reporting."

### Roadrunner's Auditors

16.     An auditor is an independent certified public accountant who examines the financial statements that a company's management has prepared.    Federal securities laws, regulations, and rules required that an independent auditor examine and report on the financial information that Roadrunner provided to the SEC and the investing public.

17.     From at least in or around 2011 and continuing through at least in or around 2017, a known public accounting firm ("Accounting Firm A") with offices throughout the United States acted as the independent auditor of Roadrunner's financial statements.

18.     Accounting Firm A relied on **ARMBRUSTER**, **WOGSLAND**, **NAGGS**, and other Roadrunner employees to provide truthful and accurate information about Roadrunner's accounting practices, policies, and financial results.    Accounting Firm A obtained information from **ARMBRUSTER**, **WOGSLAND**, **NAGGS**, and other Roadrunner employees through phone calls, meetings, emails, and file-sharing services.

19.     In addition, **ARMBRUSTER**, Executive 1, Executive 2, and other Roadrunner executives signed "Management Representation Letters," which, among other things, certified to Accounting Firm A that (a) Roadrunner's financial statements and financial information was "presented in conformity with ["Generally Accepted Accounting Principles" or "GAAP"]"; (b) Roadrunner had "provided [Accounting Firm A] all relevant information and access," including "[a]ll financial records and related data"; (c) they had "no knowledge of any fraud or suspected fraud affecting the Company"; and (d) "[s]ignificant assumptions used by [Roadrunner] in making

accounting estimates [were] reasonable." **NAGGS** also signed certifications, attesting that he was not aware of "any material misstatements, financial or otherwise, which may require disclosure," and that "all transactions [were] properly recorded in accordance with" the relevant accounting rules.

20. Based, in part, on the information and representations provided by **ARMBRUSTER, WOGSLAND, NAGGS**, and other Roadrunner finance personnel, Accounting Firm A also offered an opinion as to whether Roadrunner's annual financial statements fairly presented, in all material respects, Roadrunner's financial position. Accounting Firm A's opinion was signed and filed contemporaneously with Roadrunner's annual SEC Form 10-K.

### Roadrunner's Lenders

21. Bank A was a federally insured depository institution with branches throughout the United States. From at least 2011 to at least 2017, Bank A was one of Roadrunner's main corporate lenders. Bank A also served as the administrative agent for a revolving credit agreement between Roadrunner, Bank A, and Roadrunner's other lenders. Between approximately 2011 and 2017, Roadrunner borrowed funds under the credit agreement to finance Roadrunner's operations and acquisitions of transportation companies.

22. Roadrunner's revolving credit agreement contained certain financial covenants, including a requirement that Roadrunner's debt-to-income ratio stay below a set maximum. Roadrunner was required to submit quarterly compliance certificates to Bank A. **ARMBRUSTER** signed and certified in these compliance certificates to Bank A that he made a "detailed review" of the transactions during the quarter and that the "financial data and computations evidencing [Roadrunner's] compliance with the covenants" were "true, complete and correct."

## Roadrunner's Publicized Financial Metrics

23.     In addition to filing quarterly and annual reports with the SEC, Roadrunner also published quarterly and annual financial results to shareholders and the investing public. Among other metrics, Roadrunner reported its income, revenue, and earnings. Roadrunner also published guidance forecasting certain financial results for future quarters.

24.     Stock-market analysts followed and reported on Roadrunner's financial results. Analysts also provided their own guidance and projections of Roadrunner's anticipated financial results, which were primarily calculated as anticipated earnings or income per publicly traded share of stock ("earnings per share" or "EPS"), based in part upon information published by Roadrunner.

## THE SCHEME TO DEFRAUD

### Overview of the Scheme

25.     From in or around at least 2013, through in or around at least January 2017, **ARMBRUSTER, WOGSLAND, NAGGS,** and their co-conspirators agreed to: (a) defraud Roadrunner's shareholders, lenders, and the investing public; and (b) mislead Roadrunner's independent auditors, lenders, and regulators by making and causing others to make false and fraudulent statements about Roadrunner's financial condition.     As described below, **ARMBRUSTER, WOGSLAND, NAGGS,** and their co-conspirators used and agreed to use a combination of methods to accomplish the scheme.

26.     *First*, beginning as early as 2014, **ARMBRUSTER, WOGSLAND, NAGGS,** and their co-conspirators concealed millions of dollars in misstated accounts at several operating companies, including uncollectible debts and receivables, and assets with little to no value. As described below, **ARMBRUSTER, WOGSLAND, NAGGS,** and their co-conspirators determined that most, if not all, of these accounts needed to be written off. **ARMBRUSTER,**

**WOGSLAND, NAGGS**, and their co-conspirators initially developed a plan to write off or cleanup a portion of the misstated accounts in 2015, but never wrote off the vast majority of the misstated accounts. When the misstated accounts resurfaced more than two years later in October 2016, **ARMBRUSTER**, Executive 2, and other Roadrunner management estimated that the misstated accounts had grown to between $25 million and $50 million. Notwithstanding the size of the misstated accounts, **ARMBRUSTER** again certified the accuracy of Roadrunner's financial statements to Roadrunner's shareholders, Accounting Firm A, Bank A, and the investing public.

27. *Second*, beginning as early as 2013, **ARMBRUSTER** and his co-conspirators created a "cushion" or cookie jar of funds that they used to fraudulently inflate Roadrunner's financial performance. As part of its acquisitions, Roadrunner often included contingent earnout payments, which entitled the seller to additional compensation if the acquired company hit certain financial targets. Rather than properly valuing these contingent earnout liabilities, as required under the relevant accounting rules, **ARMBRUSTER** and his co-conspirators selectively reduced millions of dollars in contingent earnout liabilities in order to create a "cushion" of funds that **ARMBRUSTER** and his co-conspirators then used to fraudulently inflate Roadrunner's financial performance in subsequent quarters.

28. *Third*, **ARMBRUSTER** and his co-conspirators fraudulently delayed recognizing expenses, including accruals for annual bonuses and expenses for bad debt, and purposefully misstated accounts, in order to fraudulently inflate Roadrunner's financial performance.

29. *Fourth*, **ARMBRUSTER, WOGSLAND, NAGGS**, and their co-conspirators concealed millions of dollars in misstated accounts, their manipulation of millions of dollars in contingent earnout liabilities, and their delay and reversal of expenses, and thereby misled Roadrunner's shareholders, independent auditors, lenders, regulators, and the investing public

about Roadrunner's financial condition.

Purpose of the Scheme

30.    The purpose of the scheme was for **ARMBRUSTER**, **WOGSLAND**, **NAGGS**, and their co-conspirators to mislead Roadrunner's shareholders, independent auditors, regulators, lenders, and the investing public about Roadrunner's financial condition in order to: (a) maintain and increase the market price of Roadrunner's stock; (b) maintain compliance with certain financial covenants and avoid defaulting on Roadrunner's revolving credit agreement with its lenders; and (c) unjustly enrich **ARMBRUSTER**, **WOGSLAND**, **NAGGS**, and their co-conspirators through the continued receipt of compensation, bonuses, stock, and other benefits.

## I – ARMBRUSTER, NAGGS, WOGSLAND, AND THEIR CO-CONSPIRATORS CONCEAL MILLIONS IN MISSTATED ACCOUNTS AT OPERATING COMPANIES

31.    Beginning in or around May 2014, **WOGSLAND**, **ARMBRUSTER**, and others identified misstated accounts on the balance sheets of RRIS and several other operating companies, including: (a) customer accounts receivable with static balances; (b) increasing receivables for advance payments to drivers; and (c) accounts for licenses and other assets that no longer had any actual value.

32.    Under the relevant accounting rules, Roadrunner was required to make a good-faith estimate of the likelihood that it would collect its receivables, that is, the amounts owed in connection with Roadrunner's provision of goods or services to customers or advances to drivers. Roadrunner was required to write off or set reserves for amounts it deemed uncollectible. Thus, when a debt was old or other factors indicated the debt was unlikely to be paid, Roadrunner was required to either write off or reserve for at least a portion of that debt.

33.    Beginning as early as 2014, **ARMBRUSTER**, **WOGSLAND**, **NAGGS**, and their co-conspirators identified misstated accounts and other accounting issues. Instead of writing off or appropriately reserving for the misstated accounts when they were identified, **ARMBRUSTER**,

**WOGSLAND, NAGGS**, and their co-conspirators furthered the scheme to defraud by, among other things: (a) leaving assets and receivables with little or no actual value on Roadrunner's balance sheet; and (b) deliberately concealing these overstated assets and other misstated accounts from Roadrunner's shareholders, independent auditors, regulators, lenders, and the investing public.

### ARMBRUSTER, WOGSLAND, NAGGS, and Their Co-Conspirators Conceal Over $7.5 Million in Misstated Accounts on the RRIS Balance Sheet

34. Specifically, in or around May 2014, **ARMBRUSTER** identified issues on the RRIS balance sheet with potential exposure of nearly $4.5 million. In or around May 2014, **WOGSLAND**, Executive 1, and others traveled to RRIS at **ARMBRUSTER**'s direction to review the RRIS balance sheet and identified several misstated accounts, including:

a. First, a receivable for an outstanding customer debt of approximately $500,000, which dated back to in or around 2012 and had been static (i.e., without activity) since spring 2013.

b. Second, accounts purportedly containing over $1.1 million in assets for prepaid taxes and licenses that, in fact, were for prior years and thus had little to no value.

c. Third, a large and increasing receivable related to Roadrunner's lease purchase program, which included debts owed by Roadrunner drivers who had received advances for certain maintenance, fuel, and other costs, and guarantees on tractor leases from the company. By in or around April 2014, **ARMBRUSTER, WOGSLAND**, and other Roadrunner management learned that Roadrunner was advancing far more than it was collecting, resulting in large and increasing receivables. A large portion of this receivable was uncollectible because many drivers who owed Roadrunner money had left the company, and were thus unlikely to repay the funds.

35.     In or around August 2014, at **ARMBRUSTER**'s direction, **NAGGS** and **WOGSLAND** met with RRIS employees to further discuss the misstated accounts.

36.     By in or around September 2014, **ARMBRUSTER, WOGSLAND, NAGGS**, and their co-conspirators began to describe the misstated accounts at RRIS as "unexplained variances," referring to the difference between the stated account value on the RRIS balance sheet and their actual value as estimated by **ARMBRUSTER, WOGSLAND, NAGGS**, and their co-conspirators. By in or around September 2014, **ARMBRUSTER, WOGSLAND, NAGGS**, and their co-conspirators estimated that the "unexplained variances" at RRIS exceeded $7.5 million and included: (1) customer receivables; (2) overstated accounts for prepaid taxes and licenses; and (3) lease-purchase receivables.

37.     However, instead of writing off the misstated accounts or taking adequate reserves, **ARMBRUSTER, WOGSLAND, NAGGS**, and their co-conspirators directed RRIS to leave these misstated accounts on the balance sheet and not to make any corrective adjustments until being told to do so by **ARMBRUSTER** or other senior management.

### **ARMBRUSTER, WOGSLAND, NAGGS**, and Their Co-Conspirators Plan to Write Off Some Misstated Accounts and Later Abandon the Plan

38.     By early 2015, **ARMBRUSTER, WOGSLAND, NAGGS**, and their co-conspirators developed a plan to write off approximately $2 million of the misstated accounts. However, instead of immediately writing off the full amount, **ARMBRUSTER, NAGGS**, and others directed RRIS to adjust the balance sheet incrementally, by a small amount each month, in order to conceal the nature and extent of the misstated accounts.

39.     On or about February 13, 2015, after **ARMBRUSTER** and his co-conspirators determined that poor financial performance at other operating companies needed "to be mitigated," **ARMBRUSTER** directed **NAGGS** that RRIS should not book the planned write-off for February

and to reverse any incremental write-off recorded in January.

40.     After delaying the plan to write off even a portion of the misstated accounts, **ARMBRUSTER** and **WOGSLAND** profited from the scheme by selling Roadrunner stock. Specifically, in or around February 2015, **ARMBRUSTER** sold nearly 60,000 shares of Roadrunner stock, realizing gross proceeds of more than $1.5 million.

41.     On or about February 16, 2015, **WOGSLAND** emailed **ARMBRUSTER** regarding his own plan to sell shares of Roadrunner stock, writing "[s]ince the stock was going up, I wanted to wait." Several weeks later, in or around March 2015, **WOGSLAND**, with approval from **ARMBRUSTER**, sold over 11,000 shares of Roadrunner stock, realizing gross proceeds of over $300,000.

42.     In or around June 2015, **NAGGS** directed RRIS not to take the planned write-off for May 2015, because **ARMBRUSTER** was "concerned about the enterprise." **NAGGS** told another RRIS employee that **ARMBRUSTER** "advised me not to have [RRIS] book" any incremental write-off.

43.     **ARMBRUSTER**, **WOGSLAND**, **NAGGS**, and their co-conspirators also received monthly financial reports from RRIS, many of which included results both with and without the planned monthly incremental write-offs. Despite receiving these regular updates, **ARMBRUSTER**, **WOGSLAND**, **NAGGS**, and their co-conspirators did not write off or correct the vast majority of the misstated accounts.

**ARMBRUSTER and His Co-Conspirators Continue to Conceal Millions in Misstated Accounts Even After Learning the Balance Had Grown to Between $25 Million and $50 Million**

44.     In or around August 2016, RRIS hired a new controller. In or around October 2016, the new RRIS controller raised concerns about the RRIS balance sheet to Executive 2, including the misstated RRIS accounts which, at that point, had been on the RRIS balance sheet

since at least late 2014. Executive 2 notified **ARMBRUSTER**. However, despite receiving an email highlighting that the misstated RRIS accounts still had no activity in the prior year, **ARMBRUSTER** did not adjust or correct the misstated accounts.

45. Instead, another member of Roadrunner's senior management called a meeting with **ARMBRUSTER** and Executive 2 on or about November 10, 2016. During the meeting, Executive 2 identified between $20 million and $24 million in accounting issues across several Roadrunner operating companies. The group listed the issues on a whiteboard under three headings: (a) "Known $" for known and quantified issues; (b) "Known $?" for known but *un*quantified issues; and (c) "Worry."

46. During or shortly after the meeting, **ARMBRUSTER** told Executive 2 that **WOGSLAND** had historic knowledge about the misstated RRIS accounts.

47. On or about November 11, 2016, **ARMBRUSTER** and Executive 2 received a spreadsheet summarizing the whiteboard list of accounting issues, which further quantified the potential exposure from the accounting issues to between $25.6 and $50.1 million.

48. Three days later, on or about November 14, 2016, Roadrunner filed its 10-Q for the Third Quarter of 2016 in which **ARMBRUSTER** falsely certified that, among other things, (a) "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; (b) "[b]ased on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report"; and (c) **ARMBRUSTER** had disclosed "[a]ny fraud, whether or not material, that involves

management or other employees who have a significant role in the registrant's internal control over financial reporting."

## II – ARMBRUSTER AND HIS CO-CONSPIRATORS CREATE A "CUSHION" OF MILLIONS IN EARNOUT LIABILITIES TO MANIPULATE FINANCIAL RESULTS

49.     In addition to concealing millions in misstated accounts, **ARMBRUSTER** and his co-conspirators also manipulated contingent earnout liabilities in order to fraudulently boost Roadrunner's financial performance.  Roadrunner acquired more than a dozen transportation companies between 2012 and 2014.  Most acquisitions included an up-front cash payment and contingent consideration in the form of an earnout.

50.     Under the relevant accounting rules, Roadrunner had to record these earnout payments as contingent liabilities on its balance sheet, given the potential that Roadrunner would have to pay the seller in the future.  Roadrunner was also required to periodically value the contingent earnout liabilities.  If an operating company would likely not hit its earnout targets, under the relevant accounting rules, Roadrunner was required to reduce the contingent earnout liability, thus decreasing liabilities and increasing Roadrunner's income.

51.     However, even after determining that an operating company would likely not meet its earnout targets, **ARMBRUSTER** and his co-conspirators would not write off the liability. Rather, **ARMBRUSTER** and his co-conspirators would selectively reduce the contingent earnout liabilities in order to create a "cushion" of funds.  **ARMBRUSTER** and his co-conspirators then used this "cushion" to fraudulently inflate Roadrunner's income in subsequent quarters.

52.     By selectively reducing contingent earnout liabilities and fraudulently leaving a "cushion" of funds on its balance sheet, **ARMBRUSTER** and his co-conspirators also fraudulently represented the nature of Roadrunner's financial performance by signaling that an operating company would likely hit its earnout targets.

53.     For example, in or around July 11, 2013, Individual 1 emailed **ARMBRUSTER** that "if we need a little more cushion" for the Second Quarter 2013, they could reduce contingent earnout liabilities and "use the additional $$ to book insurance or medical, wherever we may be short." Individual 1 also told **ARMBRUSTER** to leave enough "cushion" because "at year end we may need to reverse another chunk to cover some of our year end catch ups."

54.     On or about July 18, 2013, **ARMBRUSTER** proposed several "earnout income pickups," including reducing the contingent earnout liability for EFS by $495,000. As Individual 1 suggested, **ARMBRUSTER** and his co-conspirators then used the $495,000 increase in income to pay for other expenses totaling the exact same amount.

55.     By on or about January 20, 2014, **ARMBRUSTER** and his co-conspirators had determined that Roadrunner needed an additional $1.58 million in income for the Fourth Quarter of 2013, and that based on its actual and anticipated performance, R&M would "have a max [earnout] of 500K." However, rather than reducing the R&M contingent earnout liability to reflect this forecast, **ARMBRUSTER** and his co-conspirators reduced the contingent earnout liability for R&M by $1.5 million, leaving a "cushion" of over $1.7 million for **ARMBRUSTER** and his co-conspirators to use to fraudulently inflate Roadrunner's financial results in later quarters.

## III – ARMBRUSTER AND HIS CO-CONSPIRATORS DELAY BOOKING EXPENSES AND MISSTATE ACCOUNTS IN ORDER TO FRAUDULENTLY INFLATE FINANCIAL RESULTS

56.     In addition, **ARMBRUSTER** and his co-conspirators also fraudulently delayed recognizing expenses and otherwise misstated accounts in order to fraudulently inflate Roadrunner's financial performance.

57.     For example, on or about October 17, 2016, after learning that Roadrunner was "$7.587 million short of the covenant requirement" for the Third Quarter of 2016,

**ARMBRUSTER** proposed adjustments, including reversing a $756,000 accrual for annual bonuses at one Roadrunner operating company and reversing a $400,000 bad-debt expense from fraudulent customer receivables at RRIS, both of which, **ARMBRUSTER** acknowledged, "would need to be reversed in q4 2016."

58.     On or about October 20, 2016, **ARMBRUSTER** directed a Roadrunner operating company to "[r]everse the $756 and book the entire annual bonus over October to December."

59.     On or about October 21, 2016, **ARMBRUSTER** directed RRIS to "defer" $400,000 in bad-debt expenses from August and September until December.

60.     As a result of delaying these liabilities and other "adjustments," **ARMBRUSTER** and his co-conspirators fraudulently inflated Roadrunner's financial results for the Third Quarter of 2016. Among other things, these fraudulently inflated financial results were reported to Bank A with **ARMBRUSTER** certifying that these results were "true, complete, and correct."

## IV – ARMBRUSTER, WOGSLAND, NAGGS, AND THEIR CO-CONSPIRATORS CONCEAL THEIR SCHEME AND MISLEAD ACCOUNTING FIRM A, BANK A, AND SHAREHOLDERS

61.     As part of and in furtherance of the scheme to defraud, **ARMBRUSTER**, **WOGSLAND**, **NAGGS**, and their co-conspirators concealed the fraudulent scheme from Roadrunner's shareholders, independent auditors, lenders, and regulators.

62.     First, **ARMBRUSTER** signed Management Representation Letters to Accounting Firm A throughout the scheme, from approximately 2013 through the Third Quarter of 2016.

63.     For example, on or about November 14, 2016, days after **ARMBRUSTER** participated in the meeting in which the $25.6 and $50.1 million in misstated accounts were discussed and quantified, **ARMBRUSTER** signed a Management Representation Letter to Accounting Firm A for the Third Quarter of 2016. In addition to falsely certifying that Roadrunner's financial statements and financial information was "presented in conformity with"

relevant accounting principles, among other things, **ARMBRUSTER** falsely certified that "no events have occurred subsequent to the balance-sheet date and through the date of this letter that would require adjustment to or disclosure in the aforementioned financial information."

64.     On or about February 25, 2015, May 4, 2015, and August 3, 2015, **NAGGS** also falsely certified that all transactions were properly recorded in accordance with the relevant accounting rules and that he was not aware of "any misstatements."

65.     On or about February 5, 2015, **WOGSLAND** falsely told Accounting Firm A that he was not "aware of any inappropriate journal entry or other adjustment in the entity's financial records." Between in or around November 2014 and February 2015, and again in September 2015, **WOGSLAND** falsely told Accounting Firm A that he did not know of any fraudulent, suspected fraudulent, or unusual items, or any unusual entries.

66.     In addition, **ARMBRUSTER, WOGSLAND, NAGGS**, and their co-conspirators deliberately concealed the misstated RRIS accounts from Accounting Firm A, including by directing Roadrunner finance personnel to make entries that would make it more difficult for Accounting Firm A to identify the misstated accounts.

67.     For example, on or about February 9, 2015, when asked how to book the monthly write-off, **NAGGS** and **WOGSLAND** directed an RRIS finance employee to apply the write-off to accounts that were already known issues, because they "did not want to create a new balance sheet account or P&L account and have it stand out for [Accounting Firm A]."

68.     Additionally, in or around March 2015, **WOGSLAND** instructed a RRIS employee not to send "examples" to Accounting Firm A or documents that could draw attention to the misstated accounts or other accounting issues.

69.     Beginning in or around May 2015, **WOGSLAND** maintained a spreadsheet of

Truckload financial results, which included a tab summarizing over $10 million in "prior balances" across Truckload operating companies—including the misstated RRIS accounts. **WOGSLAND** circulated this spreadsheet to **ARMBRUSTER, NAGGS**, and others. However, when **WOGSLAND** sent the same spreadsheet of Truckload financial results to Accounting Firm A, he omitted the "prior balances" tab listing tens of millions in misstated accounts.

70. Second, **ARMBRUSTER** and his co-conspirators also misled Bank A and Roadrunner's other lenders about Roadrunner's financial condition. Beginning at least as early as 2013 and continuing through the Third Quarter of 2016, **ARMBRUSTER** signed compliance certificates, falsely attesting to Bank A that Roadrunner's "data and computations are true, complete and correct." In reality, however, as **ARMBRUSTER** knew, Roadrunner's financial results were misstated and did not accurately reflect millions of dollars in misstated accounts, delayed expenses, and selectively manipulated contingent earnout liabilities.

71. Finally, throughout the scheme, **ARMBRUSTER, WOGSLAND, NAGGS**, and their co-conspirators misled Roadrunner's shareholders and the investing public about Roadrunner's financial condition. By leaving millions of dollars in misstated accounts on Roadrunner's balance sheet, fraudulently creating and using a "cushion" of millions of dollars in contingent earnout liabilities, and fraudulently not recognizing and delaying expenses, **ARMBRUSTER, WOGSLAND, NAGGS**, and their co-conspirators caused Roadrunner to report fraudulently inflated earnings and financial results to Roadrunner's shareholders and the investing public, including on Roadrunner's quarterly Form 10-Qs and annual 10-Ks filed with the SEC.

### The Victims

72. Between 2014 and January 2017, Roadrunner's shareholders held over 37 million shares of Roadrunner stock.

73.     On January 30, 2017, Roadrunner announced for the first time that investors could no longer rely upon Roadrunner's financial statements from 2014 through the Third Quarter of 2016.   The prior trading day, Roadrunner's stock was trading at $11.74 a share.   By February 1, 2017, three days after the announcement, Roadrunner's share price dropped to $7.54 a share.

74.     On January 31, 2018, Roadrunner announced restated financial results.   The prior trading day, Roadrunner's stock was trading at $7.14 a share.   By February 2, 2018, three days after the announcement, Roadrunner's stock price dropped to $4.90 a share.

## COUNT ONE
## (Conspiracy to Fraudulently Influence Accountants and to Falsify Books, Records, and Accounts of a Public Company – 18 U.S.C. § 371)

75.    Paragraphs 1 through 74 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

76.    From at least in or around 2013 through at least in or around January 2017, in the Eastern District of Wisconsin and elsewhere, defendants

## PETER ARMBRUSTER
## MARK WOGSLAND
## BRET NAGGS

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, and agree with other individuals known and unknown, to commit certain offenses against the United States, namely:

a.    to knowingly and willfully, directly and indirectly, take action to coerce, manipulate, mislead, and fraudulently influence Accounting Firm A, knowing that such action, if successful, could result in rendering Roadrunner's financial statements materially misleading, while Accounting Firm A was engaged in performing reviews and audits of Roadrunner's financial statements and preparation of Roadrunner's quarterly and annual reports required to be filed with the SEC, in violation of Title 15, United States Code, Section 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2(b); and

b.    to knowingly and willfully falsify, and cause to be falsified, books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of Roadrunner, in violation of Title 15, United States Code, Sections 78m(b)(2), 78m(b)(5), and 78ff.

## Purpose of the Conspiracy

77.    The Grand Jury realleges and incorporates by reference paragraph 30 of this

Indictment as a description of the purpose of the conspiracy.

## Manner and Means of the Conspiracy

78. In furtherance of this conspiracy, and to accomplish its object, the methods, manner, and means that were used are described in paragraphs 25 through 74 of this Indictment and are realleged and incorporated by reference as though fully set forth herein.

## Overt Acts

In furtherance of the conspiracy and to achieve its objects and purpose, at least one of the co-conspirators committed and caused to be committed, in the Eastern District of Wisconsin, and elsewhere, the following overt acts, among others:

79. On or about February 5, 2015, **WOGSLAND** answered "no" when asked by Accounting Firm A: (a) "[h]ave you or anyone you know ever been asked to record a journal entry or other adjustment without proper authorization or support?"; (b) "[h]ave you or anyone you know ever been asked or coerced to record a journal entry or other adjustment that you were uncomfortable with?"; and (c) "[a]re you aware of any inappropriate journal entry or other adjustment in the entity's financial records?"

80. On or about February 9, 2015, **NAGGS** emailed **WOGSLAND** and an RRIS employee regarding the plan to write off a portion of the misstated accounts incrementally, in small amounts over the course of 2015, stating "I really don't want to create a new balance sheet account or P&L account and have it stand out for [Accounting Firm A]."

81. On or about February 9, 2015, **WOGSLAND** emailed **NAGGS** and an RRIS employee regarding the plan to write off a portion of the misstated accounts incrementally, in small amounts over the course of 2015, stating "you should also consider licenses and accrued linehaul payable," and later that "[u]nfortunately that cannot go thru bad debt expense as it will affect your AR roll."

82. On or about August 3, 2015, **NAGGS** signed a certification stating that (a) "all transactions have been properly recorded in accordance with US GAAP"; (b) **NAGGS** was not "aware of any misstatements in the monthly or quarterly information reported to Corporate"; and (c) "a review of the collectability of receivables [had] been performed and an adequate allowance [had been] provided for doubtful accounts."

83. In or around September 2015, **WOGSLAND** told Accounting Firm A there were "no instances of fraudulent, suspected fraudulent, or unusual items that [he] was asked to record" and there were no "unusual entries made during the current year."

84. On or about October 9, 2015, **NAGGS** directed an RRIS finance employee not to book any incremental write-off for September 2015.

85. On or about January 26, 2016, **WOGSLAND** sent Accounting Firm A a spreadsheet of financial results for Truckload operating companies, which omitted a tab summarizing over $12.8 million in prior balances.

86. On or about November 14, 2016, **ARMBRUSTER** signed a Management Representation Letter to Accounting Firm A.

87. On or about November 14, 2016, **ARMBRUSTER** signed a certification that was filed with Roadrunner's 10-Q for the Third Quarter of 2016, attesting that, among other things, (a) "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; (b) "[b]ased on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [Roadrunner] as of, and for, the periods presented in this report"; and

(c) **ARMBRUSTER** had disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in [Roadrunner's] internal control over financial reporting."

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO – FIVE
### (Acts to Fraudulently Influence Accountants – 17 C.F.R. § 240.13b2-2(b) & 15 U.S.C. § 78ff(a))

88.     Paragraphs 1 through 74 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

89.     From at least in or around 2013 through at least in or around January 2017, in the Eastern District of Wisconsin and elsewhere, defendants

### PETER ARMBRUSTER
### MARK WOGSLAND
### BRET NAGGS

aided and abetted by others known and unknown to the Grand Jury, on or about the dates specified as to each count below, and as to the defendant(s) specified below, did knowingly and willfully, directly and indirectly, take action to coerce, manipulate, mislead, and fraudulently influence Accounting Firm A knowing that such action, if successful, could result in rendering Roadrunner's financial statements materially misleading, in connection with Accounting Firm A's review of Roadrunner's financial statements and preparation of Roadrunner's quarterly and annual reports required to be filed with the SEC.

| Count | Defendant(s) | Approximate Date | Description of Act |
|---|---|---|---|
| 2 | **PETER ARMBRUSTER MARK WOGSLAND BRET NAGGS** | January 2015 | Booking of incremental write-off of approximately $166,000 |
| 3 | **MARK WOGSLAND** | February 5, 2015 | Statement by **WOGSLAND** to Accounting Firm A that he was not aware of any inappropriate journal entry or other adjustment |
| 4 | **MARK WOGSLAND** | September 2015 | Statement by **WOGSLAND** to Accounting Firm A that he was not aware of fraudulent, suspected fraudulent, or unusual items or unusual entries |

| Count | Defendant(s) | Approximate Date | Description of Act |
|-------|--------------|------------------|--------------------|
| 5 | **PETER ARMBRUSTER** | November 14, 2016 | Management Representation Letter signed by **ARMBRUSTER** and others, and addressed to Accounting Firm A |

All in violation of Title 15, United States Code, Section 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2(b); and Title 18, United States Code, Section 2.

**COUNTS SIX – NINE**
**(False Entries in a Public Company's Books, Records, and Accounts – 15 U.S.C.**
**§§ 78m(b)(5), 78m(b)(2) & 78ff(a))**

90. Paragraphs 1 through 74 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

91. From at least in or around 2013 through at least in or around January 2017, in the Eastern District of Wisconsin and elsewhere, defendants

**PETER ARMBRUSTER**
**MARK WOGSLAND**
**BRET NAGGS**

aided and abetted by others known and unknown to the Grand Jury, on or about the dates specified as to each count below, and as to the defendant(s) specified below, did knowingly and willfully falsify and cause to be falsified books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of Roadrunner.

| Count | Defendant(s) | Approximate Date | Falsified Book, Record, or Account |
|-------|-------------|------------------|-------------------------------------|
| 6 | **PETER ARMBRUSTER MARK WOGSLAND BRET NAGGS** | September 2014 through November 2016 | Approximately $400,000 booked as customer receivable to RRIS account |
| 7 | **PETER ARMBRUSTER MARK WOGSLAND BRET NAGGS** | September 2014 through November 2016 | Approximately $600,000 booked as prepaid taxes and licenses to RRIS account |
| 8 | **BRET NAGGS** | August 3, 2015 | Quarterly certification signed by **NAGGS** and provided to Accounting Firm A |
| 9 | **PETER ARMBRUSTER** | January 2016 through November 2016 | Approximately $900,000 booked as receivable to Roadrunner subsidiary Adrian Carriers account |

All in violation of Title 15, United States Code, Sections 78m(b)(2), 78m(b)(5), and 78ff(a); and Title 18, United States Code, Section 2.

## COUNT TEN
### (Conspiracy to Commit Securities Fraud and Wire Fraud – 18 U.S.C. § 1349)

92.     Paragraphs 1 through 74 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

93.     From at least in or around 2013 through at least in or around January 2017, in the Eastern District of Wisconsin and elsewhere, defendants

**PETER ARMBRUSTER**
**MARK WOGSLAND**
**BRET NAGGS**

did knowingly and intentionally, that is, with the intent to advance the conspiracy, combine, conspire, and agree with other individuals known and unknown, to commit certain offenses against the United States, namely:

a.     securities fraud, that is, to knowingly and willfully execute a scheme and artifice (a) to defraud any person in connection with any security of Roadrunner, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, and by statements containing material omissions, any money and property in connection with the purchase and sale of any security of Roadrunner, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), in violation of Title 18, United States Code, Section 1348; and

b.     wire fraud, that is, to knowingly and willfully, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire communications in interstate and foreign

commerce, writings, signs, signals, pictures, and sounds, for the purposes of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## Purpose of the Conspiracy

94.    The Grand Jury realleges and incorporates by reference paragraph 30 of this Indictment as a description of the purpose of the conspiracy.

## Manner and Means of the Conspiracy

95.    In furtherance of this conspiracy, and to accomplish its object, the methods, manner, and means that were used are described in paragraphs 25 through 74 of this Indictment and are realleged and incorporated by reference as though fully set forth herein.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS ELEVEN – THIRTEEN
## (Securities Fraud – 18 U.S.C. §§ 1348 and 2)

96.     Paragraphs 1 through 74 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

### Purpose of the Scheme and Artifice to Defraud

97.     The Grand Jury realleges and incorporates by reference paragraph 30 of this Indictment as a description of the purpose of the scheme and artifice.

### The Scheme and Artifice to Defraud

98.     The Grand Jury realleges and incorporates by reference paragraphs 25 through 74 of this Indictment as a description of the scheme and artifice.

99.     From at least in or around 2013 through at least in or around January 2017, in the Eastern District of Wisconsin and elsewhere, defendants

### PETER ARMBRUSTER
### MARK WOGSLAND
### BRET NAGGS

aided and abetted by others known and unknown to the Grand Jury, on or about the dates specified as to each count below, and as to the defendant(s) specified below, did knowingly and willfully execute a scheme and artifice (a) to defraud any person in connection with any security of Roadrunner, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, and by statements containing material omissions, any money and property in connection with the purchase and sale of any security of Roadrunner, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), to wit, **ARMBRUSTER**, **WOGSLAND**, and **NAGGS** made, and caused to be made, false and misleading representations to Roadrunner's shareholders about Roadrunner's financial condition.

| Count | Defendants | Approximate Date | Description |
|---|---|---|---|
| 11 | **PETER ARMBRUSTER MARK WOGSLAND BRET NAGGS** | March 2, 2015 | SEC Form 10-K for Fiscal Year 2014 |
| 12 | **PETER ARMBRUSTER MARK WOGSLAND BRET NAGGS** | August 3, 2015 | SEC Form 10-Q for Second Quarter 2015 |
| 13 | **PETER ARMBRUSTER MARK WOGSLAND** | November 14, 2016 | SEC Form 10-Q for Third Quarter 2016 |

All in violation of Title 18, United States Code, Sections 1348 and 2.

## COUNTS FOURTEEN – SEVENTEEN
### (Wire Fraud – 18 U.S.C. §§ 1343 and 2)

100. Paragraphs 1 through 74 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

101. From at least in or around 2013 through at least in or around January 2017, in the Eastern District of Wisconsin and elsewhere, defendants

### PETER ARMBRUSTER
### MARK WOGSLAND
### BRET NAGGS

aided and abetted by others known and unknown to the Grand Jury, on or about the dates specified as to each count below, and as to the defendant(s) specified below, did knowingly and willfully, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made.

### Purpose of the Scheme and Artifice to Defraud

102. The Grand Jury realleges and incorporates by reference paragraph 30 of this Indictment as a description of the purpose of the scheme and artifice.

### The Scheme and Artifice to Defraud

103. The Grand Jury realleges and incorporates by reference paragraphs 25 through 74 of this Indictment as though fully set forth herein as a description of the scheme and artifice.

### Use of the Wires

104. On or about the dates specified as to each count below, and as to the defendant(s) specified below, for the purpose of executing the aforesaid scheme and artifice to defraud, did knowingly transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds.

| Count | Defendant | Approximate Date | Description of Interstate Wire |
|---|---|---|---|
| 14 | **PETER ARMBRUSTER MARK WOGSLAND BRET NAGGS** | February 9, 2015 | Email from **WOGSLAND** routed through Roadrunner's servers in Wisconsin to **NAGGS** and RRIS in Georgia regarding incremental write-offs of the misstated accounts |
| 15 | **PETER ARMBRUSTER MARK WOGSLAND BRET NAGGS** | October 9, 2015 | Email from **NAGGS** routed through Roadrunner's servers in Wisconsin to RRIS in Georgia regarding writing off misstated accounts |
| 16 | **PETER ARMBRUSTER MARK WOGSLAND** | January 26, 2016 | Email from **WOGSLAND** routed through Roadrunner's servers in Wisconsin to Accounting Firm A in Minnesota regarding Truckload segment results and omitting information about the misstated accounts |
| 17 | **PETER ARMBRUSTER** | October 21, 2016 | Email from **ARMBRUSTER** routed through Roadrunner's servers in Wisconsin to Roadrunner subsidiary in California regarding reversal of bonus accrual |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT EIGHTEEN
### (Bank Fraud – 18 U.S.C. §§ 1344 and 2)

105.    Paragraphs 1 through 74 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

### Purpose of the Scheme and Artifice to Defraud

106.    The Grand Jury realleges and incorporates by reference paragraph 30 of this Indictment as a description of the purpose of the scheme and artifice.

### The Scheme and Artifice to Defraud

107.    The Grand Jury realleges and incorporates by reference paragraphs 25 through 74 of this Indictment as though fully set forth herein as a description of the scheme and artifice.

108.    From at least in or around 2013 through at least in or around January 2017, in the Eastern District of Wisconsin and elsewhere, defendant

### PETER ARMBRUSTER

aided and abetted by others known and unknown to the Grand Jury, did knowingly and intentionally execute a scheme and artifice (a) to defraud a financial institution, and (b) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false of fraudulent pretenses, representations, or promises, to wit, between 2013 and at least January 2017, **ARMBRUSTER** executed and attempted to execute a scheme to defraud Bank A and to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, Bank A, by means of false of fraudulent pretenses, representations, and promises to Bank A.

All in violation of Title 18, United States Code, Sections 1344 and 2.

## COUNT NINETEEN

**(Securities Fraud – 15 U.S.C. §§ 78j(b) & 78ff; 17 C.F.R. §§ 240.10b-5 & 240.10b5-2)**

109.     Paragraphs 1 through 74 of the Indictment are realleged and incorporated by reference as though fully set forth herein.

110.     In or around March 2015, in the Eastern District of Wisconsin and elsewhere, defendant

### MARK WOGSLAND

knowingly and willfully, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and facilities of national securities exchanges, in connection with the purchase and sale of securities, used and employed, and caused others to use and employ, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing, and causing others to employ, devices, schemes, and artifices to defraud; (b) making, and causing others to make, untrue statements of material fact and omitting to state, and causing others to omit to state, material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging, and causing others to engage, in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, on the basis of material, non-public information obtained from his employer, **WOGSLAND** executed and caused to be executed trades in the securities of Roadrunner.

All in violation of Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5 and 240.10b5-2.

## FORFEITURE ALLEGATION
### (18 U.S.C. § 981(a)(1)(C))

111.    The allegations of this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of certain property in which the defendants, **PETER ARMBRUSTER**, **MARK WOGSLAND**, and **BRET NAGGS**, have an interest.

112.    Upon conviction of a violation of Title 18, United States Code, Section 371, and/or a violation of, or a conspiracy to violate, Title 18, United States Code, Sections including 1343, 1344, 1348, 1349; Title 15, United States Code, Sections 78ff, 78j(b); and Title 17, Code of Federal Regulations, Parts 240.13b2-2, 240.10b-5, and 240.10b5-2 as alleged in this Indictment, the defendants so convicted shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real or personal, which constitutes or is derived from proceeds traceable to the commission of such violation.

### Substitute Assets

113.    If any of the above described forfeitable property, as a result of any act or omission of the defendants:

      a.  cannot be located upon the exercise of due diligence;

      b.  has been transferred or sold to, or deposited with, a third party;

      c.  has been placed beyond the jurisdiction of the Court;

      d.  has been substantially diminished in value;

      e.  or has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), made applicable by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

114.  All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and the provisions of Title 21, United States Code, Section 853, made applicable by Title 28, United States Code, Section 2461(c).

A TRUE BILL.

Grand Jury Foreperson
Date: _____ 4/2/19 _____

MATTHEW D. KRUEGER
United States Attorney

ROBERT ZINK
Acting Chief
United States Department of Justice
Criminal Division, Fraud Section

HENRY P. VAN DYCK
Deputy Chief
DAVID STIER
CAITLIN R. COTTINGHAM
Trial Attorneys
United States Department of Justice
Criminal Division, Fraud Section
Securities and Financial Fraud Unit